**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: DOMESTIC DRYWALL ANTITRUST LITIGATION** | **MDL No. 2437** <br> **13-MD-2437** |
| **THIS DOCUMENT RELATES TO: THOMPSON RESEARCH GROUP, MOTION TO QUASH (14-MC-52)** | |

**MEMORANDUM OF LAW RE THOMPSON RESEARCH GROUP'S
MOTION TO QUASH SUBPOENA**

Baylson, J.                                                                                    May 15, 2014

## I.      Introduction

Disputes about confidential information and sources consume much judicial energy, but often with good cause.  Whether the confidences relate to national security or a company's trade secrets, a judge must be sensitive to the value of confidences in general, and in the specific case, when resolving disputes about access.  The issue presented is whether Plaintiffs in these antitrust cases, asserting price fixing in the sale of domestic drywall, should have access to the reports and investigative files prepared by a nonparty, which collects information—often from sources it keeps confidential—about the domestic drywall industry.

On December 10, 2013, Plaintiffs served nonparty Thompson Research Group, LLC ("TRG") with a subpoena duces tecum.  The subpoena made several requests for documents, but only three requests are relevant here.[1]  TRG filed a Motion to Quash the subpoena in the Middle District of Tennessee.  The matter was transferred to this Court pursuant to 28 U.S.C. § 1407(b).

---

[1]  *See* ECF 10, Case No. 13-cv-194 (M.D. Tenn.) (Status Report and Joint Statement of Issues) (stipulating that the only unresolved issues regarding TRG's Motion to Quash concern Requests 1, 2, and 4).

ECF 17, Case No. 13-mc-194 (M.D. Tenn.).  The Court held a hearing on TRG's Motion on April 24, 2014.

TRG's Motion is granted in part and denied in part. The Court will modify the subpoena and condition the disclosures in accordance with the issues addressed in this memorandum.

## II.    Facts

TRG is a company that conducts research on the construction materials industry.  TRG's findings and opinions are published in reports, which it sells to large institutional investors, such as mutual funds and hedge funds, as a tool for providing investment advice.  The reports cover industry-wide trends and provide company-specific analysis.  TRG does not publish its reports to the public.  To the contrary, TRG takes several precautions to keep them confidential, including the use of online publishing software that controls and tracks who receives the reports.  TRG also maintains specific policies that prohibit its employees and clients from providing its research to third parties.

One method TRG uses to generate research for these reports involves conducting surveys and interviews with various sources within the construction materials industry.  The information provided by these sources enables TRG to track and analyze important trends and developments within the industry.  TRG's network of sources includes employees from public and private companies, U.S. Senate and House of Representative contacts, and state officials.  The identities of these sources are confidential.  TRG's sources provide information to TRG based on an agreement that their identities and specific affiliations will not be disclosed.  Accordingly, TRG does not publish the name of a source or the company the source works for without the source's consent.  Over several years, TRG has developed an extensive network of confidential sources within the industry.  This network is a critical component of TRG's business.

In 2011, several manufacturers announced a price increase for drywall beginning in January 2012.  In 2012, these manufacturers announced a similar price increase that would take effect in January 2013.  These price increases are at the center of Plaintiffs' antitrust claims.  During this period, TRG monitored the price increase announcements and the market conditions of the drywall industry.  For example, in October 2011, TRG published a report entitled *Wallboard Industry: A Game Changing Strategy*, which opined on pricing behavior in the drywall industry.

Through its subpoena, Plaintiffs seek various documents from TRG that they believe will lead to the discovery of evidence that can be used in their antitrust suit.  TRG seeks to quash three of the subpoena's requests.  They are:

Request 1.  All reports, studies, forecasts, analyses, articles, presentations or surveys drafted by You related to the market for Wallboard, including those concerning prices, costs, profits, Job Quotes, industry conditions, market concentration, markets in terms of geographic location or product type, competition, entry or exit of suppliers in the market for Wallboard, supply and demand, profitability, production capacity and fungibility or interchangeability, or substitutes for Wallboard, whether published or not, in draft and final form, including "Wallboard Industry: A Game Changing Strategy" and Your October 2011 Flashnote.

Request 2.  All Documents concerning any of the statements made in any of the specific Documents referenced in the preceding request, including any notes or materials used to prepare those Documents.

Request 4.  All communications with or concerning any Defendant or other Wallboard Manufacturer relating to the pricing of, or use of Job Quotes for, Wallboard.

ECF 1-1, Case No. 13-mc-194 (M.D. Tenn).

## III.   Legal Standard — Rule 45 and Third-Party Subpoenas

Federal Rule of Civil Procedure 26 sets forth the general scope of discovery in civil suits: "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's

claim or defense."  Fed. R. Civ. P. 26(b)(1).  "Although the scope of discovery under the Federal

Rules is unquestionably broad, this right is not unlimited and may be circumscribed."  *Bayer AG*

*v. Batachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999).  Discovery requests may be curtailed to

protect a person from whom discovery is sought from "annoyance, embarrassment, oppression,

or undue burden or expense."  Fed. R. Civ. P. 26(c)(1).

Rule 45 provides corresponding protections for nonparties subject to subpoena.  After

being served with a subpoena duces tecum, a nonparty may object to producing any or all of the

requested information by serving a written objection on the party or person designated in the

subpoena.  An objection must be served to the subpoenaing party within fourteen days after the

subpoena is served, but it need not be filed with the court.[2]  Fed. R. Civ P. 45(d)(2)(B).  After

providing notice to the subpoenaed nonparty, the subpoenaing party may move the court to

compel compliance with the subpoena.  *Id.* 45(d)(2)(B)(i).

Alternatively, a subpoenaed nonparty may bypass objecting to the subpoena altogether

and, instead, seek to have it quashed by filing a motion with the issuing court.  Rule 45(d)(3)(A)

describes when a court *must* quash or modify a subpoena, such as when a request

 "subjects a person to undue burden."  Rule 45(d)(3)(B) and (C) describe when a court *should*

quash or modify a subpoena, unless the subpoenaing party can show a substantial need for the

requested material and the court can specify conditions of production that accommodate the

interests of the subpoenaed nonparty.  *See* Wright & Miller, 9A *Fed. Prac. & Proc. Civ.* § 2463.1

(3d ed.).  Material protected under Rule 45(d)(3)(B) includes "a trade secret or other

confidential research, development, or commercial information" or "an unretained expert's

---

[2] Contemporaneously with the filing of its Motion to Quash, TRG served Plaintiffs with objections to the subpoena.

opinion or information that does not describe the specific occurrences in dispute and results from the expert's study that was not requested by a party."

"The serve-and-volley of the federal discovery rules govern the resolution of" a motion to quash.  *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 164 F.R.D. 623, 625 (E.D. Pa. 1996).  The subpoenaing party must first show that its requests are relevant to its claims or defenses, within the meaning of Federal Rule of Civil Procedure 26(b)(1).  *Id.* at 625-26.  Next, the burden shifts to the subpoenaed nonparty who must show that disclosure of the information is protected under Rule 45(d)(3)(A) or (B).  *Id.* at 626.  If the subpoenaed nonparty claims the protections under Rule 45(d)(3)(B) or asserts that disclosure would subject it to undue burden under Rule 45(d)(3)(A), it must show that disclosure will cause it a "clearly defined and serious injury." *City of St. Petersburg v. Total Containment, Inc.*, Case No. 06-cv-20953, 2008 WL 1995298, at *2 (E.D. Pa. May 5, 2008) (undue burden under Rule 45(d)(3)(A)); *In re Mushroom Direct Purchaser Antitrust Litig.*, Case No. 06-cv-0620, 2012 WL 298480, at *5 (E.D. Pa. Jan. 31, 2012) (disclosure of trade secrets under Rule 45(d)(3)(b)(i)).  "This burden is particularly heavy to support a motion to quash as contrasted to some more limited protection such as a protective order."  *Frank Brunckhorst Co. v. Ihm*, Case No. 12-cv-0217, 2012 WL 5250399, at *4 (E.D. Pa. Oct. 23, 2012).

If the subpoenaed nonparty demonstrates a "clearly defined and serious injury" for a claim of undue burden under Rule 45(d)(3)(A), the Court conducts a balancing test, discussed below, in which it weighs the subpoenaing party's interest in disclosure and the subpoenaed nonparty's interest in non-disclosure to determine whether the burden on the subpoenaed nonparty is, in fact, undue.  If the subpoenaed nonparty demonstrates a "clearly defined and serious injury" for a claim of protection under Rule 45(d)(3)(B), an additional step is required.

The burden shifts to the subpoeaning party to show "a substantial need for the testimony or material that cannot be otherwise met without undue hardship," Fed. R. Civ. P. 45(d)(3)(C)(i), and demonstrate "that the subpoenaed [nonparty] will be reasonably compensated," *id.* 45(d)(3)(C)(ii).  If the subpoenaing party makes this showing of substantial need, the Court then weighs the interests in the disclosures.

This balancing test requires a Court to weigh (1) the relevance, (2) need, (3) and confidentiality of the requested materials, as well as (4) the harm that compliance would cause the subpoenaed nonparty.  *Mannington Mills, Inc. v. Armstrong World Indus., Inc.* 206 F.R.D. 525, 529 (D. Del. 2002) ("[E]ven if the information sought is relevant, discovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit.").  A court should be "particularly sensitive to weighing the probative value of the information sought against the burden of production on [a] nonparty."  *Fears v. Wilhelmina Model Agency, Inc.*, Case No. 02-cv-4911, 2004 WL 719185, at *1 (S.D.N.Y. Apr. 1, 2004).

## IV.    Contentions

Here, there are two types of material at issue: (1) TRG reports related to the drywall industry and (2) the investigative files on which those reports were based.

TRG argues that these requests should be quashed because (1) they subject TRG to "undue burden," Fed. R. Civ. P. 45(d)(3)(A)(iv); (2) they require the disclosure of "a trade secret or other confidential research, development, or commercial information," *id.* 45(d)(3)(B)(i); and (3) they require TRG to disclose "an unretained expert's opinion," *id.* 45(d)(3)(B)(ii).[3]

---

[3]  TRG also argued in its briefing that the subpoena requests require "disclosure of privileged or other protected matter," Fed. R. Civ. P. 45(d)(3)(A)(iii).  Specifically, TRG contended that Tennessee's Shield Law, Tenn. Code 24-1-208, creates a privilege over the requested material.  At oral argument, TRG conceded that privileges created by state law are not applicable to this case.  *See EEOC v. Ill. Dept. of Emp't Sec.*, 995 F.2d 106, 108 (7th Cir.

Specifically, TRG argues that producing the requested reports would amount to a "taking" of its unretained expert opinion.  According to TRG, the reports contain research and expert analysis that are proprietary and confidential.  Because Plaintiffs could obtain specific company and market analysis by hiring their own experts, Plaintiffs cannot demonstrate a need for the reports. Additionally, TRG contends that producing these materials will likely expose the identities of TRG's confidential sources—a critical component of its business which took many years and great expense to develop.

Plaintiffs contend that these reports and investigative notes are necessary to their suit because they contain what are likely to be the only contemporaneous communications made by drywall manufacturers about pricing decisions during the period of the alleged conspiracy. Plaintiffs also argue that TRG may have served as a conduit through which drywall manufacturers passed information to further the conspiracy.  Under this theory, TRG's communications with its confidential sources are a potentially critical component to Plaintiffs' case.  Moreover, they argue that any potential harm TRG could experience will be adequately addressed by the Court's standing protective order governing the collection of discovery.

The defendant drywall manufacturers take no position on TRG's motion.

## V.    Discussion

The Court's analysis will proceed as follows.  Part V.A discusses the relevance of the subpoenaed materials to Plaintiffs' case.  Part V.B discusses whether the TRG reports are entitled to subpoena protection under Rule 45(d)(3)(B).  Part V.C. discusses whether the investigative files are entitled to similar protection.  Part V.D examines Plaintiffs' "conduit theory" to determine whether they have demonstrated a substantial need to overcome any Rule

---

1993) ("State privileges are honored in federal litigation only when state law supplies the rule of decision.  When federal law governs, as it does here, only privileges recognized by the national government matter.").

45(d)(3)(B) protections available to the reports and investigative files.  Part V.E balances the interests that Plaintiffs have in obtaining the subpoenaed materials with TRG's interests in preventing their disclosure.  Part V.F discusses what compensation TRG should receive for complying with the subpoena.  Part V.G addresses whether complying with the subpoena would pose an undue burden on TRG.  Part VI discusses future steps and the scope of TRG's production.  Part VII briefly concludes.

### A.  TRG's Reports and Investigative Files Are Relevant to the Case

At the outset, Plaintiffs have identified that the reports and investigative files meet the requisite degree of relevance required for nonparty discovery.  There is a "general policy of allowing liberal discovery in antitrust cases."  *Zukoski v. Phila. Elec. Co.*, Case No. 93-cv-4780, 1994 WL 637345, at *3 (E.D. Pa. Nov. 14, 1994); *see also Callahan v. A.E.V. Inc.*, 947 F. Supp. 175, 179 (W.D. Pa. 1996) ("Discovery in an antitrust case is necessarily broad because allegations involve improper business conduct. . . . Such conduct is generally covert and must be gleaned from records, conduct, and business relationships.").  Nevertheless, the "standards for non-party discovery require a stronger showing of relevance than for party discovery."  *Zukoski*, 1994 WL 637345, at *3.  Plaintiffs have met this requirement.  Not only have they demonstrated that the requested materials are reasonably calculated to lead to information related to the pricing behaviors of drywall manufacturers during the period of the alleged conspiracy, they have also shown that at least one of the reports specifically discusses this subject matter.  This satisfies the higher relevancy burden required for nonparty discovery.

To prevail on its motion, TRG must show that the requested information falls within the protection of Rule 45.

**B.      The TRG Reports Are Entitled to Rule 45 Protection**

TRG claims that disclosing the reports and other materials enumerated in Request 1

constitutes "disclosing an unretained expert's opinion or information that does not describe

specific occurrences in dispute and results from the expert's study that was not requested by a

party." Fed. R. Civ. P. 45(d)(3)(B)(ii).  TRG's reports are a valuable product.  They principally

contain two kinds of material: factual statements from sources within the industry and expert

analysis—often based on their sources' statements.  TRG's resistance to the subpoena concerns

both kinds of material because they constitute "information that the producing party has

accumulated through its own time and effort."  *Cohen v. City of New York*, 255 F.R.D. 110, 118

(S.D.N.Y. 2008).  It would thus be unjust, so the argument goes, "to require a party to turn over

the fruit of its labor in discovery without receiving adequate compensation."  *Id.*

But TRG goes further—it does not want to disclose its reports at all.  TRG contends that

Plaintiffs could obtain the same analysis contained in the reports by hiring their own expert to

opine on the status of the drywall market during the relevant period.  According to TRG, to

permit discovery of TRG's reports and underlying research would simply enable Plaintiffs to

benefit from its expertise for free.

This contention is not without merit.  The Advisory Committee for the Federal Rules of

Civil Procedure had this very concern in mind[4] when it drafted Rule 45(c)(3)(B)(ii).[5]  TRG also

_____

[4]  The 1991 Amendment Advisory Committee Notes provide:

Clause (c)(3)(B)(ii) provides protection for the intellectual property of the non-party witness. . . .
A growing problem has been the use of subpoenas to compel the giving of evidence and
information by unretained experts.  Experts are not exempt from the duty to give evidence, . . . but
compulsion to give evidence may threaten the intellectual property of experts denied the
opportunity to bargain for the value of their services.  Arguably, the compulsion to testify can be
regarded as a "taking" of intellectual property.  The rule establishes the right of such persons to
withhold their expertise, at least unless the party seeking it makes the kind of showing required for
a conditional denial of a motion to quash as provided in the final sentence of subparagraph

cites *In Re Subpoenas Duces Tecum to Lehman Bros. Kuhn Loeb, Inc.*, 1983 U.S. DIST. LEXIS 11752 (S.D.N.Y. Nov. 14, 1983), as additional support.  There, the court refused to compel a nonparty to produce documents that pertained to the underlying litigation but also contained expert work product.  In so ruling, the court observed that "it would be unfair to Lehman to compel it to perform expert services free of charge."  *Id.* at *3.  TRG also cites to *In the Matter of Application of Consumers Union of United States, Inc.*, which held that a plaintiff was not entitled to confidential testing data based on the nonparty's independent research. 27 F.R.D. 251, 254 (S.D.N.Y. 1961) (observing that "plaintiff seeks to obtain the benefit of an expert's work and conclusions free of cost").

As an initial matter, *Consumers Union* is inapposite.  There, the court did not enforce the subpoena because the plaintiff did not advance an adequate reason to justify the disclosure.  *Id.* at 253.  As discussed *infra*, that is not the case here.  The Court is also unpersuaded by the analysis in *Lehman Bros.*, for the court's decision in quashing the subpoena does not adequately consider whether some discovery requested by the subpoena was permissible.  Rarely are subpoena requests an all or nothing issue.  It is the duty of the court to find the middle ground.  *Deitchman*

---

(c)(3)(B); that requirement is the same as that necessary to secure work product under Rule 26(b)(3) and gives reasonable assurance of compensation.

Although the present motion does not concern expert testimony, the commentary is illustrative of the concern that the subpoena power could be used to procure commercially valuable intellectual property without compensation.

[5]  Rule 45(c)(3)(B) was recently redesignated as Rule 45(d)(3)(B) in 2013.  That provision provides:

(B) When [Quashing or Modifying a Subpoena Is] Permitted.  To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unrelated expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

Fed. R. Civ. P. 45(d)(3)(B).

*v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 565 (7th Cir. 1984) (observing that a lower court's ruling to quash did not consider the "possibility of a partial solution").

Rule 45 has been amended since *Lehman Bros.* was decided in 1983.  The amendments direct courts to take a more nuanced approach.[6]  The Advisory Committee Notes to the 1991 Amendments instruct courts to distinguish between a request for material from an expert that relates to "knowledge of facts relevant to the case" versus a request that seeks expert opinion. Fed. R. Civ. P. 45, adv. comm. notes.  This distinction is evident in the rule itself: the rule extends only to expert information "that does not describe specific occurrences in dispute."  *Id.* 45(d)(3)(B)(ii); *see also In re Pub. Offering PLE Antitrust Litig.*, 233 F.R.D. 70, 77 (D. Mass. 2006) ("Because the antitrust plaintiffs sought factual information from [a nonparty that had written articles related to the underlying price-fixing accusation] describing specific events and occurrences in dispute in the antitrust litigation, such information is not shielded by Rule 45(c)(3)(B)(ii)." (internal quotation marks and original alterations omitted)); *Arkwright Mut. Ins. Co. v. National Union Fire Ins. Co.*, 148 FRD 552, 557 (S.D.W. Va. 1993) (observing that Rule 45(d)(3)(B)(ii) is not applicable where the subpoenaing party "seeks primarily factual information").

Given the current formulation of the rule and the precedent interpreting it, the statements attributed to TRG's confidential sources are clearly of a factual nature that falls outside the protections of Rule 45(d)(3)(B)(ii).

The analysis in the reports, however, is another story.  As TRG points out, observations such as one manufacturer having "a history of notoriously little pricing discipline" but "has exhibited greater pricing discipline in the past 6-12 months," ECF 14 at 11, Case No. 13-mc-194

---

[6] Prior to the 1991 Amendments, the rules provided limited guidance to courts.  *See* Fed. R. Civ. P. 45(b) (1990) (instructing courts to quash or modify a subpoena if it was "unreasonable and oppressive").

(M.D. Tenn.), are TRG's expert opinion regarding that manufacturer's market behavior.  This does seem like the type of opinion that is contemplated by Rule 45.  Moreover, disclosure of TRG's analysis will work a clear and serious injury on TRG because it is substantially similar to the kind of market analysis Plaintiffs will need to conduct themselves by retaining (and paying) experts.  Accordingly, the analysis in the reports is entitled to protection under Rule 45(d)(3)(B)(ii).

Additionally, TRG claims, and is entitled to, protection for the reports—and thus protection for the factual statements attributed to its confidential sources that appear in the reports—under Fed. R. Civ. P. 45(d)(3)(B)(i), as confidential research and confidential commercial information.  In determining whether requested information is a trade secret or otherwise confidential information coming under the protection of Rule 45, "a court may consider such things as the extent to which the information is known both inside and outside the business; the precautions taken to guard the secrecy of the information; the value of the information; and the amount of time and expense it would take for others to acquire and duplicate the information."  *Universal Del., Inc. v. Comidata Network, Inc.*, Case No. 10-mc-104, 2011 WL 1085180, at *3 (M.D. Tenn. Mar. 21, 2011).

TRG contends that it keeps its reports confidential by requiring its clients to agree not to disseminate them without permission and by employing electronic-monitoring measures.  TRG is also very selective about to whom it agrees to sell its products—limiting its client list to institutional investors.  Although TRG's goal of preserving the confidentiality of its reports is only mildly successful—Plaintiffs were able to procure a copy of a relevant report from the internet—the Court agrees that the reports come under the protection of Rule 45(d)(3)(B)(i).

### C.    The Investigative Files Are Also Entitled to Rule 45 Protection

TRG also contends that its investigative files constitute confidential commercial

information and confidential research under Rule 45(d)(3)(B)(i).  It argues that disclosure of

these files would reveal the identities of its confidential sources within the drywall industry.

According to the affidavit TRG submitted with its motion, exposing the identities of these

sources would cause TRG tremendous injury and possibly financial ruin, for its network is a

primary contributor of value to its reports.

Upon consideration of the *Universal Delaware* factors, the Court concludes that TRG's

network of sources constitutes confidential material.  The identities of these sources are not

known outside of the company, TRG does not publish any source's identity in its reports unless

given permission to do so, the network of sources has taken years to develop, and it constitutes

one of the main stores of value for the company.  TRG has also shown that disclosure would

likely cause it serious injury because exposed sources would likely no longer be willing to

provide information if TRG were unable to guarantee the confidentiality of their identities.

Accordingly, the investigative files qualify for protection under Rule 45(d)(3)(B).

### D.    Plaintiffs' Conduit Theory Shows They Have a Substantial Need for TRG's Information

The burden now shifts to Plaintiffs to establish that (1) they have a substantial need for

the requested disclosures and (2) the information sought from the disclosures cannot otherwise

be obtained without undue hardship.  To satisfy this burden, Plaintiffs have shown that in

preparing its reports TRG communicated with key industry executives, including individuals

employed by some of the defendant drywall manufacturers, during the period of the alleged

conspiracy.  Based on the report that TRG filed with the Court under seal, it appears that at least

some of TRG's reports were based on conversations with knowledgeable industry personnel about company-specific pricing behavior and pricing trends across the industry.

Plaintiffs argue they have a substantial need for the subpoenaed material because they believe that the reports, and the underlying conversations between TRG and its confidential sources, may have been used as a vehicle to signal or share non-public pricing information to participants in the alleged conspiracy.  Use of a third party to facilitate a price-fixing conspiracy is not alien to antitrust law.  *See, e.g.*, *In re Titanium Dioxide Antitrust Litig.,* 959 F. Supp. 2d 799, 806 (D. Md. 2013) (denying summary judgment where communications with an industry consultant suggested that he acted as a conduit for information sharing for a price-fixing scheme).

### 1.      TRG Reports

With regards to the reports, Plaintiffs seek to use them not for an analysis of the drywall market itself, but for what TRG's analysis may have communicated to the alleged conspirators, either expressly by the published statements attributed to TRG sources or inferentially by the analysis that these statements may have been designed to generate.  Let us take an example already introduced: the observation that a manufacturer has "a history of notoriously little pricing discipline" but "has [recently] exhibited greater pricing discipline in the past 6-12 months," ECF 14 at 11, Case No. 13-mc-194 (M.D. Tenn.).  Although this statement may be classified as an opinion, it also could have the effect of communicating that a once uncooperative manufacturer has now brought its pricing behavior in line with an existing agreement with its competitors— that is, that the manufacturer now "has exhibited greater pricing discipline" within the last six to twelve months.  According to Plaintiffs, if all the alleged conspirators had access to TRG's reports, then commentary on a participant's likely future behavior could be a useful indicator of

whether the participant was abiding by the conspirators' agreement or whether the conspirators would have to exert pressure on that participant to enforce the agreement.

To support this notion, in a supplemental letter to the Court filed under seal, Plaintiffs represented that each drywall manufacturer possessed at least some of the TRG reports. Specifically, Plaintiffs represented that between October 4 and October 7, 2011 the defendant manufacturers attended a trade association conference.  Plaintiffs further represented that all defendants internally circulated copies of a TRG report entitled "Wallboard Industry: A Game-Changing Strategy in Play" dated October 3, 2011 during the same time period.  Plaintiffs contend that they may not have a full set of TRG reports during the relevant period and thus need the full set from TRG.  The Court is persuaded by this showing that Plaintiffs have a substantial need for the factual statements attributed to confidential sources published in TRG's reports.

The Court recognizes that Plaintiffs have also demonstrated a non-frivolous need for the analysis in TRG's reports.  But the Court is not convinced this need is substantial, at least at this stage in discovery. Plaintiffs seek the reports to find out what pricing information TRG may have communicated to all the defendant manufacturers.  The Court believes that access to the statements attributed to confidential sources published in the reports, coupled with the notes detailing researcher-to-contact conversations, *see infra*, will satisfy that need while simultaneously being less intrusive into TRG's proprietary interests.

By way of example, suppose a report contains the following two sentences:

Sentence 1:   A source at Company X has informed TRG that the company intends to announce a price increase for all drywall products within the next three months.

Sentence 2:   Based on past market behavior, TRG believes that this announcement will be mimicked by Company X's competitors.

15

Plaintiffs have demonstrated a substantial need for disclosure of Sentence 1's statement because it is a statement solely based on information communicated by a source to TRG. But TRG will not have to disclose a statement of the type in Sentence 2, as it is a matter of TRG's expert analysis and opinion for which Plaintiffs have not yet demonstrated a substantial need.

Finally, for the same reasons the Court finds that TRG's reports constitute confidential information, it is clear that Plaintiffs cannot obtain a complete set of the relevant reports without undue hardship. Given TRG is the only reasonable source for these reports, as well as Plaintiffs' demonstration of substantial need, Plaintiffs have satisfied their burden under Rule 45(d)(3)(C) as to the factual statements attributed to TRG's sources only.

### 2.    Investigative Files

With regards to the reports' underlying investigative files, Plaintiffs' strongest argument for substantial need is the possibility that TRG may not simply have been a passive receiver of information when it reached out to its sources—that is, in its dialogues with industry contacts, TRG may have commented on what other confidential sources had said and thereby may have relayed pricing behavior from one manufacturer to another. In its supplemental letter to the Court, Plaintiffs supported this theory by attaching excerpts of e-mails between a manufacturer defendant and TRG from October of 2010 and March and July of 2011. In these e-mails, a TRG representative communicated with an executive at a defendant drywall manufacturer, requesting him to speak with her about market trends; in exchange, TRG offered to share feedback from TRG's recent distributor survey. The executive agreed and provided his phone number.

These e-mails would allow a reasonable fact-finder to infer that TRG disclosed the information provided by an employee of one defendant manufacturer to an employee of another defendant manufacturer. Moreover, they underscore why Plaintiffs have a substantial need for

the investigative notes, as the e-mails make clear that at least some of the conversations happened over telephone—and thus would not be discoverable by subpoenaing e-mails and other documents from defendant manufacturers but would be discoverable by subpoenaing TRG's notes of phone conversations with these manufacturers.

Whether this information contributed to the conspiracy or not is a question for another day.  The simple fact that TRG engaged in these communications establishes that Plaintiffs have a weighty interest in learning, not just what industry officials reported to TRG, but what TRG may have relayed across companies.[7]

The Court is persuaded that Plaintiffs have demonstrated a substantial need for any notes or other documents that convey the substance of TRG's communications with its confidential sources in the drywall industry.  The TRG report and TRG e-mails presented to the Court indicate that personnel from drywall manufacturers commented to TRG about pricing during the time of the alleged conspiracy.  Learning what was said in these conversations could yield valuable factual information.  To the extent that TRG's motion attempts to block Plaintiffs from discovering this factual information, it is contrary to the policy of broad factual discovery permitted under Rule 26.

A question remains about whether Plaintiffs could obtain the substance of these communications without undue hardship.  It is conceivable that Plaintiffs could attempt to extract the substance of some of TRG's communications by deposing various officials from the defendant manufacturers and asking whether they ever spoke to a TRG researcher. Admittedly, time constraints, the expense of numerous depositions, and the unknown number of people who could have possibly served as a TRG source could make this a hunt for a needle in a haystack. This surely would constitute undue, and likely fruitless, hardship that Plaintiffs need not

---

[7]  This is not to be taken as any implication that TRG was a participant in the alleged conspiracy.

undertake.  However, the Court is not convinced that Plaintiffs would be left wandering so unguided.  For example, discovery from defendant manufacturers may lead to the unearthing of e-mails between drywall employees and TRG researchers—as the exhibits in Plaintiffs' supplemental letter illustrate.  Plaintiffs could then depose these contacts and gather information about any conversations with TRG researchers.

That being said, the Court is also mindful that the aggregation of all the TRG conversations may present a probative mosaic that is simply not captured by the substance of a few conversations revealed by e-mails or by deposition.  This is especially true with regards to discovering what information TRG researchers may have communicated between industry contacts.  The deposition of one source may reveal what a TRG researcher told the deponent, but it will not reveal what information, if any, TRG communicated to other sources, and so on. Having access to TRG's investigative files would shed light on what a TRG researcher gathered from one source and conveyed to another.  This type of information is likely only ascertainable from the investigative files.

Finally, the record does not disclose whether there are any other networks of drywall industry sources that were being mined for information at the time of the alleged price increases. Networks of this type require time and considerable expense to develop.  Accordingly, as Plaintiffs advanced at oral argument, the notes of TRG's conversations may be the only evidence of contemporaneous communications among drywall manufacturers available.

Plaintiffs have demonstrated that these conversations took place; that they directly relate to the contested activity; that the participants in these conversations include personnel from across the drywall industry; that TRG has documented the substance of these conversations; and

that TRG is likely the only entity that knows what information it communicated across industry contacts.  Accordingly, Plaintiffs have satisfied their burden under Rule 45(d)(3)(C).

> ### E.    The Balance of Interests Weighs in Favor of Partial Disclosure

Now that TRG has demonstrated that the requested disclosures are entitled to protection under Rule 45(d)(3)(B), and Plaintiffs have demonstrated a substantial need for the disclosures, the Court must now balance these competing interests.  *Mannington Mills,* 206 F.R.D. at 529; *see also Mycogen*, 164 F.R.D. at 626 ("Although . . . Rule 45 protects trade secrets, that protection is not absolute.").

The foregoing discussion has already covered the interests that must now be weighed. Plaintiffs have demonstrated that the requested materials are relevant, and TRG has demonstrated that the materials are highly confidential.  Much has also already been said about the potential harm TRG faces and Plaintiffs' need for the requested materials.  These two latter factors, however, warrant further discussion.

Although a litigant is generally entitled to broad discovery, a nonparty may hold such a strong interest in withholding certain material that a court will not compel the nonparty to comply with a subpoena, even when a strong need for the information has been demonstrated. *See, e.g.*, *Mgmt. Info. Tech., Inc. v. Alyeska Pipeline Serv.*, 151 F.R.D. 478, 481-82 (D.D.C. 1993) (precluding disclosure of whistleblower identities); *Richards of Rockford, Inc. v. Pacific Gas & Elec. Co.*, 71 F.R.D. 388, 389 (N.D. Cal. 1976) (precluding disclosure of research-participant identities).  However, a court may be able to protect a nonparty's interest by tailoring the manner in which the material is produced and used.  *See, e.g.*, *United States v. Valencia*, Case No. 04-cr-514, 2006 WL 3707867, at *7-8 (S.D. Tx. Aug. 25, 2006) (permitting disclosure of trade data but requiring certain redactions to preserve confidential sources).  Thus, in balancing

the interests at stake, a court must first identify the strength of the nonparty's interest at issue and then determine if that interest can be preserved by a protective order.

### 1.      Confidential Source Statements in the TRG Reports

In assessing the interests surrounding the reports, the Court observes that TRG does not have a particularly strong interest in not disclosing the statements of sources that were published in its reports.  Disclosure of these published statements does not necessarily pose a risk of revealing the identity of a source.  In addition, TRG does not face exposure to financial harm by disclosing the discussed excerpts to Plaintiffs.  Indeed, TRG has made no showing that its ability to sell its reports to other willing buyers would be harmed by producing the reports at all.

Although little harm exists as to the statements in the reports, the Court is sensitive to TRG's concerns about disclosing the reports' proprietary analysis—particularly in this scenario where Plaintiffs will likely have to pay experts to generate similar analysis.  On the other hand, the Court also recognizes that TRG's analysis may itself have provided signals to the alleged conspirators.  But based on the interests at stake, the Court believes that incremental discovery into TRG's documents is the best course.  Once Plaintiffs have reviewed the excerpts from the reports, they may seek further discovery into their analytical content.  Armed with supporting documentation from this initial phase of TRG discovery, Plaintiffs may be better equipped to craft a narrowly-tailored request that demonstrates their substantial need for further access to the reports.

Accordingly, at this point, Plaintiffs may only discover from TRG's reports the statements that were made by, or attributed to, TRG's confidential sources in those reports that fall within the scope of the subpoena.  Protection of TRG's proprietary analysis will be achieved by redacting those portions of the reports that contain expert analysis and conclusions.

### 2.      Confidential Source Communications in the Investigative Files

#### a.      Strength of TRG's Interest

In assessing TRG's interest in protecting the identities of its confidential sources, the Court observes that the circumstances of this case have few parallels.  Traditionally, the disclosure of a trade secret does not constitute an undue burden because a court can limit to whom the disclosure is made and the purposes for which it can be used.  In other words, courts can institute protective orders that require, for instance, that only outside counsel have access to the highly sensitive information, thus ensuring that the trade secret remains secret. This prevents diminishing the value of the nonparty's proprietary material or providing a nonparty's competitors with information from which they can glean a commercial advantage.  *See Infosint S.A. v. H. Lundbeck A.S.*, Case No. 06-cv-2869, 2007 WL 1467784, at *1-2 (S.D.N.Y. May 16, 2007) (granting protective order covering proprietary technical information in patent case); *IPC Info. Sys., LLC v. Odyssey Group, Inc.*, 232 F.R.D. 206, 207 (S.D.N.Y. 2005) (requiring disclosure of customer lists subject to protective order).

In this case, however, the nature of the confidential commercial information in the investigative files presents a somewhat different set of circumstances.  A trade secret does not cease functioning if it is disclosed during discovery; the formula or trade data will continue to serve its purpose after it is disclosed just as well as before.  This may not be said for confidential sources.  The fact that a confidential source may be revealed in litigation poses the risk of chilling that source's willingness to exchange information in the future.  In a detailed memorandum in *In re Cigna Corp. Sec. Litig.*, this Court required disclosure of the content of a confidential source's communications, but not the source's identity, because disclosure of confidential sources "would chill informants from providing critical information which may end

up being in the public eye." Case No. 02-cv-8088, 2006 WL 263631, at *3 (E.D. Pa. Jan. 31, 2006). If a confidential source is not confident that his identity will be shielded from discovery in litigation, the source may cease cooperating.

At first blush, TRG's network of confidential sources seems analogous to the confidential sources maintained by a journalist. This, however, is a false analogy for at least three reasons. First, the confidential sources of a journalist are protected by a journalistic privilege derived from federal common law—they do not find protection under the confidential commercial information provision of Rule 45(d)(3)(B)(i). *See Riley v. City of Chester*, 612 F.2d 708, 715-17 (3d Cir. 1979) (recognizing a journalist's privilege in civil cases). Second, journalistic privilege requires "an intent at the inception of the newsgathering process to disseminate investigative news to the public." *In re Madden*, 151 F.3d 125, 129-30 (3d Cir. 1998). As TRG has made clear by the pains it takes to keep its reports confidential, it actively works to prevent the results of its investigative research from being disseminated to the public. TRG thus has not, and cannot, claim this privilege. Third, and most importantly, is where harm results from a revealed identity. If a journalist reveals a confidential source, the public is harmed because a chilled source diminishes the journalist's ability to generate important, newsworthy information for the public. By contrast, a chilled TRG source does not affect the public; the harm is specific to TRG and entirely pecuniary—a chilled source only diminishes the value of TRG's product.

Other potential analogies exist. For instance, Judge Sporkin denied a party's discovery request where disclosure of the requested information would have revealed the identities of whistleblowers, thus exposing them to the risk of retaliation from their employers. *Alyeska,* 151 F.R.D. at 481-82. There, the court noted that insulating from retaliation those individuals who spoke out as a matter of conscience on an issue of public concern outweighed the defendant's

need to discover their identities, at least until adequate measures were provided by defense counsel to assure the whistleblowers were protected from reprisal  *Id.*

In another case involving a breach of contract and defamation, the plaintiff sought to compel a nonparty, a research assistant for a university professor, to produce documents concerning confidential interviews conducted for a project that was related to plaintiff's suit. *Richards*, 71 F.R.D. at 389.  Finding similarities with the principles underlying the journalistic privilege, Judge Renfrew denied the plaintiff's discovery request because the profound interest of preserving an academic's ability to conduct scholarly research into questions of public policy, which often requires maintaining confidential relationships, far outweighed plaintiff's interest in identifying which of the defendant's employees had been interviewed.  *Id.* at 390.

Though these examples present some similarities to the case *sub judice*, the interests that weighed against disclosure in those cases are not equivalent to the interest here.  *Aleyska* was guided by concern for insulating whistleblowers from reprisal—what may fairly be described as the public's interest in not further imperiling those who seek to speak out on behalf of the public's safety.  The interest protected in *Richards* concerned preserving academic freedom, which produces research that contributes to the public welfare.  As already mentioned, TRG cannot claim that it produces research for the good of the public.  Nor has it made any showing that its sources may be subject to retaliation if their identities are disclosed.  Instead, TRG's motion rests squarely on the premise that disclosure of its confidential sources would lead to its financial harm.

Thus, the nature of TRG's interest in preventing the disclosure of its confidential sources is not as robust as the interests in *Richards* and *Aleyska*.  This is not to say, however, that TRG's interest in preserving confidentiality is trifling.  On the contrary, it is quite strong.  The Court is

very sensitive to TRG's status as a nonparty.  *See Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993) ("Although Rule 26 applies equally to discovery of nonparties, the fact of nonparty status may be considered in weighing the burdens imposed in the circumstances.").  TRG has been asked to disclose one of the most sensitive and critical aspects of its business, the improper handling of which could imperil its financial well-being.  For a nonparty with no stake in the outcome of this litigation to undertake such a risk is a weighty interest indeed.

Perhaps the closest analogy to TRG's circumstances arose in *United States v. Valencia*, a criminal case in which natural gas traders were accused of reporting fictitious trade information to trade publications in order to affect the price of natural gas within the United States.  2006 WL 3707867, at *3.  Nonparty McGraw-Hill published *Inside FERC's Gas Market Report*, one of the trade publications to which the defendants allegedly submitted fictitious trade information.  The publication contained indices of natural gas prices, which were created by conducting monthly confidential surveys that requested detailed data on natural gas transactions from numerous companies.  *Id.* at *1-2.  In response to grand jury and other subpoenas, McGraw-Hill produced electronic and hard copies of e-mail and fax submissions sent by the defendants to *Inside FERC*; electronic databases compiled by McGraw-Hill; and spreadsheets containing survey trade data and the confidential sources that communicated that data.[8]  *Id.* at *3.  McGraw-Hill obtained a protective order from the court restricting the display of the information at trial to parties, jurors, and the court.  Additionally, the order required that only the hard copies of the data be made into the permanent trial record.  *Id.*

---

[8]  *Valencia* is not distinguishable from this case because the *Valencia* document request originated from a grand jury subpoena—a subpoena with considerably more power, and fewer constraints, than a civil discovery subpoena.  Rather, *Valencia* is instructive because of how the court treated McGraw-Hill's confidential information *after* it was produced.

Following the trial, McGraw-Hill moved to seal the data from the public trial record. McGraw-Hill argued that public disclosure of its materials—its spreadsheets, in particular—would reveal confidential sources, the sources' counterparties, and McGraw-Hill's analysis, which would betray the trust of its sources and permit competitors to replicate its proprietary methodologies. *Id.* at *7. The court recognized that McGraw-Hill's network of sources took years to develop and that gaining the trust of these sources was contingent on McGraw-Hill making representations of strict confidentiality. The court also acknowledged that revealing these sources could undermine McGraw-Hill's very ability to produce its publication and thus posed a risk of significant harm. *Id.* at *7-8.

Balancing these concerns with the public's right to understand the evidence against the defendants, the court agreed to seal some, though not all, of the data. It ordered that the identities of the confidential sources, their company affiliation, and the counterparties with which they conducted trades to be sealed. The court however did not seal the price, volume, and location data listed on the spreadsheets. Although this trade data was also given under promise of confidentiality, the court determined that the raw data alone, unassociated with trading partner identities, would not reveal any damaging information that could be used to a competitor's advantage. The court concluded that, even if competitors aggregated the data to discern buying trends, the redaction of trading partner names prevented competitors from using the information to a reporting company's disadvantage. *Id.* at *9.

*Valencia* provides useful guidance. Much like McGraw-Hill, TRG's financial interest relies heavily on preserving the confidentiality of its sources. As *Valencia* shows, the protection of a confidential network does not require that every piece of information in the investigative files be deemed undiscoverable. *Valencia* demonstrates that this interest can be adequately

protected with a narrowly-crafted protective order.  In fact, disclosure of the notes and

communications between TRG and its sources may pose less of a chilling risk than in *Valencia*.

In *Valencia*, McGraw-Hill promised that the content of the communications—which is to say,

the price, volume, and location of the natural gas trades—would remain confidential.  *Id.*  By

contrast, given TRG's practice of attributing information to undisclosed sources in its reports,

TRG's confidential sources provide information with the expectation that TRG might use and

publish it to its customers.  TRG therefore cannot claim that divulging the content provided by

its confidential sources would be inimical to TRG's existence.  It is the exposure of a source's

identity that poses that risk.

Accordingly, the Court will permit discovery of the investigative files provided that the

disclosure is narrowly tailored and preserves the confidentiality of TRG's sources.  TRG is

permitted to redact the names of its confidential sources from the investigative files it produces.

### b.        The Basis for Plaintiffs' Need

The Court's requirement that the disclosure of the investigative files be narrowly tailored

turns on the basis upon which Plaintiffs have established their need for the material.  The Court

is permitting discovery of these investigative files based on Plaintiffs' conduit theory—that is,

that TRG may have unwittingly acted as a vehicle for enabling a conspiratorial agreement among

the defendant manufacturers.  Plaintiffs have established the existence of information-sharing

communications between TRG and a defendant manufacturer that lends plausibility to this

theory.  Plaintiffs' conduit theory, therefore, will strictly guide and limit the scope of discovery

into the investigative files.

Although maintaining the confidentiality of TRG's sources is a primary concern, the

Court is also unwilling to provide Plaintiffs with unrestricted access to a nonparty's proprietary

information if Plaintiffs cannot demonstrate with at least some evidence that an investigative file

relates to its conduit theory.  For example, the Court will permit access to TRG's investigative

files where the Plaintiffs can show some evidence that warrants a look into a specific file, time

period, or company.  Where no such showing can be made, Plaintiffs' need will give way to

TRG's interest in keeping its research confidential.

 For the reasons stated, the Court concludes that Plaintiffs' have satisfied Rule 45(d)(3)(C)

by showing substantial need for some of TRG's reports and investigative files and that this

information cannot be obtained by other means without undue hardship.

 **F.**  **To What Extent TRG Is Entitled to Compensation**

 TRG has demonstrated that the expert reports, the investigative files, and other

underlying research materials, come under the protection of Rule 45(d)(3)(B).  Accordingly,

"reasonable compensation must accompany disclosure" of these documents.  *Klay v. All*

*Defendants*, 425 F.3d 977, 983 (11th Cir. 2005); *see also* Fed. R. Civ. P. 45(d)(3)(C)(ii)

(permitting disclosure of materials protected under Rule 45(d)(3)(B) where the subpoenaing

party "ensures that the subpoenaed person will be reasonably compensated").

 **1.**  **TRG's Out-of-Pocket Expenses for Production**

 Under Rule 45(d)(3)(C)(ii), TRG is entitled to "compensation for time expended and

expenses incurred in complying with the subpoena[]."  *Cohen*, 255 F.R.D. at 126.  Specifically,

TRG's production will require time and resources as TRG (1) identifies the reports that fall

under the scope of Request 1; (2) parses statements made by, or attributed to, TRG's sources

from the rest of each report's analysis; (3) administers the appropriate redactions; and (4)

distributes these materials to Plaintiffs.  TRG will have to undergo a similar process of review

and redaction for its investigative files.  Plaintiffs will provide TRG with reasonable

compensation for these efforts, including attorney's fees.[9]  *See* Fed. R. Civ. P. 45(d)(2)(B)(ii)

(providing that a court "must protect a person who is neither a party nor a party's officer from

significant expense resulting from compliance"); *E.E.O.C. v. Kronos, Inc.*, 694 F.3d 351, 372 (3d

Cir. 2012) ("We also adopt the general proposition that a non-party should not be expected to

bear as great an expense as a party when complying with a subpoena . . . .").

### 2.    TRG's Intellectual Property

TRG argues that requiring it to divulge information from its reports and its investigative

files would not only require it to spend its own funds on compliance, but also would constitute a

"taking" of its intellectual property.  TRG's position is not devoid of merit.  The Advisory

Committee Notes establish that the drafters of Rule 45(c)(3)(B) (now, Rule 45(d)(3)(B)) were

concerned about the uncompensated "taking" of intellectual property.[10]  Accordingly, Rule

45(d)(3)(C)(ii) was fashioned to accommodate the taking of a subpoenaed party's intellectual

property by requiring the subpoenaing party to provide reasonable compensation.  Rule 45, adv.

comm. notes.  The Court thus must determine the measure of compensation, if any, for

disclosure of intellectual property covered under Rule 45(d)(3)(B).

In the absence of controlling Third Circuit precedent, the Eleventh Circuit's decision in

*Klay* is instructive on this point and appears to be the most authoritative appellate holding.[11]

---

[9]  The Court will leave the details of this aspect of compensation to discussions between counsel for Plaintiffs and TRG in the first instance.  If counsel cannot come to an agreement within fourteen (14) days, the Court should be advised by letter and a conference will be scheduled.

[10]  *See supra* note 4.

[11]  Although not directly on point because they deal with administrative subpoenas, two Third Circuit cases provide some guidance as to whether a nonparty is entitled to compensation for complying with a subpoena.  Rule 45 does not apply to administrative subpoenas.  *United States v. Friedman*, 532 F.2d 928, 937) (3d Cir. 1976).  Nevertheless, these decisions applied the principles underlying Rule 45 by analogy.  In *EEOC v. Kronos*, the court looked to *Friedman*—a case that examined Rule 45 at a time when the rule did not expressly provide for reasonable compensation—to enumerate principles that district courts should consider "with respect to fairness in subpoena enforcement proceedings."  694 F.3d 351, 371-72 (3d Cir. 2012) (quoting *Friedman*, 532 F.2d at 937).  *Kronos* described these principles as follows:

There, a nonparty that was requested to disclose confidential data argued that Rule 45(c)(3)(B)

(now, Rule 45(d)(3)(B)) entitled it to the same license fee that it normally charged its clients for

dissemination of the confidential data.  *Klay*, 425 F.3d at 980-81.  The Eleventh Circuit

disagreed.  To assess the amount of compensation required, the court developed the following

standard.

> The gain to the party seeking confidential information through a subpoena is not
> the measure of compensation reasonably owed to the owner of that information.
> The measure is the loss to the owner of the property. If the enforcement of a
> subpoena under Rule 45(c)(3)(B) causes no loss, then the amount of
> compensation reasonably owed will be zero. If the loss to the owner of the
> information is substantial, then so will be the amount of compensation even if the
> gain to the taker of the information is slight.

*Id.* at 985.

In generating this standard, the court looked to Supreme Court and Eleventh Circuit

takings jurisprudence.  The court noted that "in taking real property, 'just compensation is

determined by the loss to the person whose property is taken.'" *Id.* (quoting *Ala. Power Co. v.

FCC*, 311 F.3d 1357, 1369 (11th Cir. 2002)); *see also United States v. Causby*, 328 U.S. 256,

261 (1946) ("It is the owner's loss, not the taker's gain, which is the measure of the value of

property taken.").

*Klay* also concluded that the measure of compensation owed in a takings case depends on

the nature of the property: whether the property is "rivalrous" or "nonrivalrous."  Property is

---

the primary consideration in fairly allocating the cost of compliance with an administrative
subpoena is whether the cost of compliance with the subpoena exceeded that which the respondent
may reasonably be expected to bear as a cost of doing business.  Such an inquiry requires at least
some evidence to support a party's assertion about what the actual costs of compliance will be.
We also adopt the general proposition that a non-party should not be expected to bear as great an
expense as a party when complying with a subpoena, a principle which finds support in the fact
that Rule 45 distinguishes between reimbursement for parties and non-parties.

*Id.* at 372 (internal quotation marks and citations omitted).  These principles will be informative if there is no
agreement on costs and the Court has to determine the precise amount of compensation owed to TRG for the costs
of complying with the subpoena.  They do not, however, provide guidance for whether compensation is owed for
any intellectual property that TRG may disclose to Plaintiffs.

rivalrous when "its possession by one party results in a gain that precisely corresponds to the loss endured by the other party." *Klay*, 425 F.3d at 985 (internal quotation marks omitted). Property is nonrivalrous when "use of the property does not necessarily diminish the use and enjoyment of others." *Id.* (internal quotation marks omitted). "Compensation for nonrivalrous use of the property will ordinarily be limited to the marginal cost incurred by that use." *Id.* The court deemed this limitation proper because "'one immutable principle in the law of just compensation . . . is that the value to the taker is not to be considered, only loss to the owner is to be valued." *Id.* (quoting *Metro. Transp. Auth. v. ICC*, 792 F.2d 287, 297 (2d Cir. 1986)).

From these principles, *Klay* concluded that expert testimony is a form of rivalrous property "because the measure of its loss to the owner is the same as the gain to its taker." *Id.* Conversely, *Klay* concluded that the conditioned production of confidential information was nonrivalrous property. Because the confidential material in *Klay* was subject to a protective order forbidding its use for nonlitigation purposes, its disclosure to outside counsel "did not deprive [the nonparty] of the use of its property in any way" nor did it "deprive the [nonparty] of the opportunity to sell its intellectual property at its market price to any willing buyers." *Id.* Accordingly, *Klay* held that the nonparty was not entitled to the licensing fees it normally charged its clients for use of the data.

The Court adopts *Klay* and proceeds according to its principles. *Cf. Cohen*, 255 F.R.D. at 118-119 (adopting the principles discussed in *Klay* to resolve a motion to quash). Here, as long as the identity of TRG's sources are not disclosed, the excerpts from the reports and investigative files are nonrivalrous property—that is, the use of the materials by Plaintiffs does not diminish the value of the materials to TRG. Indeed, given that the subpoena requests documents between January 2010 through January 2013, it is an open question whether the information has become

stale and retains any value to TRG at all.  Even if stale, the Court presumes that TRG's intellectual property deserves protection; it does not, however, warrant requiring Plaintiffs to compensate TRG for use of the intellectual property because—excepting the loss incurred by producing this material, which TRG will be compensated for—TRG suffers no loss from Plaintiffs' use of the information.

Accordingly, the Court, upon request, may impose a protective order requiring redaction of TRG's materials and consider any other restrictions presented to it.  TRG will thus not experience a "taking" of its intellectual property and is therefore not entitled to compensation beyond the costs associated with producing the material.

### G.      No Undue Burden Exists

Lastly, TRG claims that Plaintiffs' subpoena subjects it to undue burden under Rule 45(d)(3)(A).  To determine whether a subpoena imposes an undue burden, the court must consider "(1) [the] relevance of the information requested; (2) the need of the party for the documents; (3) the breadth of the document request; (4) the time period covered by the request; (5) the particularity with which the party describes the requested documents; and (6) the burden imposed."  *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004); *see also United States v. Int'l Bus. Mach Corp.,* 83 F.R.D. 97, 104 (S.D.N.Y. 1979) (enumerating identical factors).

TRG claims that the subpoena requires it to spend a substantial amount of time reviewing documents spanning a three-year period regarding all documents relating to broad topics.  It notes that it publishes 350-400 reports annually.  Coupled with the investigative files, TRG contends that this volume of material is unduly burdensome.  TRG also asserts that its strongest

ground for undue burden is the risk of exposing its confidential sources that would be associated with disclosure.

In response, Plaintiffs note that TRG's contentions about "all documents" over a three-year period overlooks an important limiting factor. The subpoena defines "documents" to those "found in the files of agreed upon custodians and in all reasonably accessible or central enterprise files." ECF 1-1 at 2, Case No. 13-mc-194 (E.D. Pa.). Additionally, although TRG may publish 350-400 reports a year, Plaintiffs are only seeking those reports that relate to the market for drywall. This further reduces the burden on TRG.

Although it is true that compliance with the subpoena will require TRG to review and redact numerous reports and investigative files, this burden is not undue because Plaintiffs will compensate TRG. Moreover, these required redactions from the requested materials will prevent the release of TRG's proprietary analysis. It will also preserve the confidentiality of its sources—TRG's primary concern. In light of these added protections, the subpoena, subject to the modifications and conditions of the Court's protective order, does not subject TRG to undue burden.

## VI.    Future Steps and the Scope of TRG's Production

The Court has already entered a protective order in the underlying action. ECF 56, Case No. 13-md-2435 (E.D. Pa.) ("MDL Protective Order"). Its protections apply to nonparties. MDL Protective Order ¶ 11. Accordingly, any disclosures that TRG makes are permitted to be used for this litigation only and for no other purpose. MDL Protective Order ¶ 2. TRG may also designate any disclosure it makes as HIGHLY CONFIDENTIAL and thus limit its availability to those listed in the order. MDL Protective Order ¶¶ 1.4, 4.2.

TRG argues that the protections available under the MDL Protective Order may be insufficient.  The Court may, if requested, enter a separate protective order that supplements the protections available to TRG.

The Court will give TRG and Plaintiffs fourteen (14) days to submit either a joint, or separate, proposed order(s) for addressing the issues raised in this memorandum.  The proposal should include the followings points:

•Measures that secure the confidentiality of TRG's sources, such as redacting the names of confidential sources;

•Measures that ensure that discovery into TRG's investigative files is narrowly confined;

•How Plaintiffs will compensate TRG for the costs of its compliance with the subpoena.

Plaintiffs will only be entitled to excerpts from the published versions of TRG's reports, as Plaintiffs have not demonstrated a substantial need for draft excerpts.  The basis for Plaintiffs' need for the reports turns on what these reports conveyed to their subscribers, which may include the alleged conspirators.  Material printed in drafts that did not make its way into the reports is thus beyond the scope of Plaintiffs' need.

## VII.    Conclusion

Considering TRG's legitimate interest in protecting its confidential information, along with Plaintiffs' legitimate interest in obtaining information important to their case that TRG, and TRG alone, likely has in its possession, the Court concludes that the modifications and conditions described in this memorandum provide adequate protections and allowances. Plaintiffs will be able to obtain information to support their cause without undermining TRG's confidentiality interests.  As the discovery process runs its course, the Court will leave open the

possibility of further discovery.  This, however, will require a stronger showing by Plaintiffs than has been presented here.

TRG's Motion to Quash is granted in part and denied in part.  An appropriate order follows.


O:\13-MD-2437 - drywall\TRG Mot to Quash Memo 5.15.docx